Mr. Chief Justice Sharkey
delivered the opinion of the court.
The only object'of this bill was to vacate a particular provision in the last will and testament of Nathaniel H. Hooe, by which certain slaves in this state were to be removed to Africa, to be emancipated. The testator’s domicil was in Yirginia, where the will was made, and where he died. It is contested only so far as it undertakes to emancipate the slaves in this state, and as to one other clause which directs the sale of real estate for the purpose of raising a fund for removing the slaves to Africa, and for paying them, on their arrival there, certain sums of money. The validity of this testamentary disposition raises a question on the conflict of the laws of Yirginia and of this state. The disposition of the slaves is admitted to be valid by the laws of Yirginia, but it is contrary to a statute of this state, passed in 1842, prior to the testator’s death, which occurred in 1844; the will having been also made in that year.
By the tenth item of the will, the testator declared, that he did thereby emancipate and set free, to all intents and pur *273 poses, all his slaves in Virginia, except those specifically devised, and directed that those emancipated should be sent to Africa by the executors, and their expenses paid out of any money that might have accrued from the sale of lands, or by the collection of debts. He further emancipated and set free all the slaves which he had loaned to William D. Hooe; and he further emancipated and set free all his slaves in Mississippi, to be also sent to Africa, as directed' in reference to his slaves in Virginia. He appointed five executors, three in Virginia, one in the District of Columbia, and the appellant, Mahorner, in this state.
The act of 1842, which is said to be violated by the above bequest, is in these words : “ That hereafter it shall not be lawful for any person, by last will or testament, to make any devise or bequest, of any slave or slaves for the purposes of emancipation, or to direct that any slave or slaves shall be removed from this state for the purposes of emancipation elsewhere.” Acts of 1842, p. 69, sec. 11. The power to make a testamentary provision for the removal of slaves from this state to Liberia, for the purposes of emancipation, prior to the passage of this act, was sustained by this court in the case of Ross v. Vertner, 5 How. 305, which was decided at December term, 1840. It will be seen, by reference to dates, that shortly after this decision was made, the subject was taken up by the legislature, and the law changed, and a different policy adopted.
The chief ground relied on for the appellant is, that as Virginia was the place of the testator’s domicil, the will having been also made there, and as this is a disposition of personal or movable property, valid by the laws of Virginia, the laws of that state must control it, on the general doctrine that the law of the domicil must furnish the rule of succession, and testaments.
That this is true as a general rule, on principles of comity, is a position which has not been controverted. It has been recognized by this court, after a very full and thorough investigation, in the case of Garland v. Rowan, 2 S. & M. 617. In that case, it was decided that distribution of personal property within this state, would be made according to the laws of Virginia, the *274 place of the intestate’s domicil. But we are now to inquire whether this rule of comity is one of universal application, and therefore to control the present case, or whether it is not abolished by the law of 1842.
It is undoubtedly true, that every state may regulate the transfer of property real and personal within its limits, either by last will, or inter vivos, because all property must be bound by its laws. The necessary result of sovereignty is a power to regulate and bind property according to prescribed rules, not inconsistent with the fundamental law of the state. This general proposition is not denied, but the argument pressed upon us is, that by comity the law of the domicil of the owner is the law of personal property wherever it may be, and that this law will prevail unless it be expressly excluded in terms. That it is not changed by implication, merely because it is repugnant to the laws of the state in which the property is situated, and this position it is said, is sustained by authority. Pressed to the extent to which the counsel would carry it, the bequest could be sustained; but this is inconsistent with the idea of mere comity, which is an act of courtesy. Nor do the authorities go to that length; on the contrary, they establish a limit much short of it.
In administering foreign laws, courts act upon the presumption that they have been tacitly adopted, but this presumption is only to be indulged in the absence of any law restraining or denying their operaiion. And such restraint may result as effectually from the general scope and object of a state law, as from prohibitory language. The presumption must of necessity cease when the foreign law is in direct conflict with a positive prohibitory law of a state, regulating its policy. “In the silence of any positive rule, (says Judge Story) afñrming, or denying, or restraining the operation of foreign laws, courts of justice presume the tacit adoption of them by their own government, unless they are repugnant to its policy, or prejudicial to its interests.” (Conflict of Laws, 37, sec. 38.) What, then, if a foreign law be contrary to the policy of a state 7 It is not to be presumed to have been adopted of course. And this section *275 of the commentator must apply with increased force, when state policy is indicated by a prohibitory law, which has for its object the regulation of policy alone. Where such a law exists, there is no room for presumption; the state has spoken positively. And if it be a law of property merely, without regard to individual rights, it will apply to all property within the limits of the state, whether owned by citizens or foreigners.
This same exception was very explicitly recognized by the supreme court in the case of the Bank of Augusta v. Earle, 13 Peters, 589. In reference to contracts, Chief Justice Taney said, “Courts of justice have always expounded and executed them, according to the laws of the place in which they were made; provided that law was not repugnant to the laws or policy of their own country. The comity thus extended to other nations, is no impeachment of sovereignty. It is the voluntary act of the nation by which it is offered; and is inadmissible when contrary to its policy, or prejudicial to its interests.” There is no difference between a law of contracts and a law of property; the principles of comity are the same as applicable to both.
In the case of Forbes v. Cochrane, 2 Barn. & Cress. 448, Mr. Justice Best said, it is a maxim that the law of comity cannot prevail in any case where it violates the law of our own country, the law of nature, or the law of God. And in the case of Saul v. His Creditors, 17 Louisana Rep. the court said, that no nation will suffer the laws of another to interfere with her own to the injury of her citizens.
In sec. 25 of the Conflict of Laws, Judge Story says, “ No nation can be justly required to yield up its own fundamental policy and institutions, in favor of those of another nation. Much less can any nation be required to sacrifice its own interests in favor of another; or to enforce doctrines, which in a moral or political view, are incompatible with its own safety, or happiness, or conscientious regard to justice and duty.” And again, in sec. 472, when speaking of the administration of foreign laws, in cases of wills and testaments, he says, “ But the discussion in which we are engaged does not respect the *276 effect of any local prohibitory laws over movable property within the particular territory; but the general pi'inciples which regulate the disposition of it, where no such prohibitory laws exist.”
In the case of Garland v. Rowan, it was said in the decision, that “ An exception to the general rule, as firmly settled as the rule itself, is, that the international law, or law of comity, is not permitted to operate within a state to the prejudice of the government, in opposition to its settled policy, or to the interests of its citizens.”
As a general rule, a contract, valid where it is made, will be enforced everywhere. Conflict of Laws, sect. 242. And still the exception prevails, that no nation is bound to recognize or enforce any contracts which are injurious to its own interests, or to those of its own subjects. Ib. sec. 244. Whiston v. Stodder, 8 Martin’s R. 95. The reason would seem to be even stronger for holding that property within a state should be subject in all respects to its laws, where they differ from the law of the domicil, than it is in regard to contracts; as in the one case the laws operate on the thing, and in the other on ,the person.
The principle which seems to be clearly established by these authorities is, that no foreign law, by mere rule of comity, can be allowed to counteract a general prohibitory law, which regulates the policy of a state, or, in which all the citizens of the state are interested. With regard to mere enabling laws, or laws which regulate successions in a manner differing from the law of the domicil, comity may require that they should yield, as nothing but individual rights are affected, which may well be held to yield to the general benefits resulting from national comity.
Are there any authorities which sanction a different conclusion, and sustain counsel in the position that foreign laws are not restricted except by express declaration, or by an intention plainly and manifestly embodied in the law 1 Section 383 of the Conflict of Laws, is cited for this purpose; it is in this language: “ It follows as a natural consequence of the rule, *277 which we have been considering (that personal property has no locality) that the laws of the owner’s domicil should in all cases determine the validity of every transfer, alienation, or disposition made by the owner, whether it be inter vivos or post mortem. And this is regularly true, unless there is some positive or customary law of the country where they are situate, providing for special cases, (as is sometimes done,) or, from, the nature of the particular property, it has a necessary implied locality.” We understand the author as only alluding to the general rule, without regard to the exceptions. And the law “providing for special cases” can be understood to refer to such cases as would otherwise be subject to the rules of comity. But it has been shown, we think, that a certain class of cases do not fall within the customary range of comity. For such cases, special provisions are unnecessary; and to such, therefore, the remarks of the author cannot apply. We do not understand him as saying that the law of the domicil will in all cases control the alienation or disposition of movable property elsewhere, for that is contrary to what he has previously said.
The case of Sneed v. Ewing, 5 J. J. Marshall, 460, has also been referred to, in which the court used this language : “ The rule is not universal, because it is not obligatory on a state that withholds its assent to it.” “ But the rule as to the law of the domicil has generally obtained, and will apply where it has not been interdicted.” “ Conceding that a state may rightfully refuse to admit the application within its borders of a public law adopted by other states for regulating international rights, still such a selfish policy should not be attributed to any respectable state, without clear proof that it was intended.” If by this language we are to understand the court as holding that a special and particular interdiction is necessary to exclude the operation of the lex domicilii, we cannot yield an assent to the proposition. It is probable, however, that the court did not intend to push the doctrine to that extremity, as it was admitted in the outset that the rule was not universal. We hold that the interdiction may result from general laws, declaring public *278 policy, as well as from special laws, framed for that purpose. And whilst we freely concede that in this confederacy of states, comity is indispensable, and should be extended in the most ample manner, yet it cannot be allowed to defeat the general policy of a state, declared by the legislative authority. We have nothing to say as to the good or bad policy of the law of 1842; it is sufficient for us to know that the legislature thought it wise and proper. Courts in this country have not the power to declare policy, except as it may be indicated by direct legislation, or result from the spirit and object of statutes. And here we would say a word in reference to an objection made to this law on the ground of its being contrary to the policy of that provision in the constitution which, at the time, prohibited the introduction of slaves into this state. We do not perceive any such repugnancy as would avoid the law. It might have been good policy to exclude slaves (that provision has been changed); and it may also be good policy to retain what we have. At all events it was competent to discountenance emancipation by last will and testament, by defeating the declared intention of the testator, although that intention was to be consummated beyond the limits of the state. A sovereignty may guard its policy by imposing restrictions on all property within its limits. It may look to the ultimate destination of that property- abroad; and if that destination be incompatible with the best interests of the state, the intention of the testator may be defeated if it has been made known. We accordingly think the law of 1842 is a valid prohibition, paramount to that rule of comity, which, in the absence of such prohibition, might sustain the bequest on the law of the testator’s domicil.
For the appellant it is argued, however, that even assuming that clause of the will which directs the. negroes in Mississippi to be emancipated, to be void, still the appellees, as distributees, will not be entitled to these negroes, because there is a residuary clause in favor of the appellant. This position rests upon a provision in the 10th Item, which is in the following words : “ My executors to pay the expenses of transporting my slaves *279 to Africa, and paying them, are authorized to use any money that may come to their hands from the sale of my lands herein directed to be sold, or from the collections of money due me by bond or otherwise. Having made ample provision for the transportation and payment of my slaves in Africa, should there be a surplus left of money, it may be equally divided between Mathias Mahorner, my executor, and John Yeatman, above-mentioned; and should there be a deficiency of money to carry out my design of emancipating my slaves, then the slaves that may be under the care of Mathias Mahorner, may be retained on my cotton farms three or four years to make up the deficiency of money lacking.” This is not a general residuary clause. The surplus spoken of is too clearly confined to the residue of a particular fund to leave any room for doubt. It was not the residue of his property, but any surplus of money that might have accrued from the sale of the land directed to be sold, or from debts due, after the expenses of transporting the slaves to Africa had been defrayed out of that particular fund. This is entirely apparent from the context of the 8th and 10th Items, which refer to one another, and are to be construed together. The one provides the means, and the other directs the end. By the 8th Item the testator had directed certain lands to be sold, and the money arising therefrom, and all other collections of money, were to be deposited in certain banks “ for purposes mentioned in the 10th Itemand in this item he appropriates the fund, and disposes of the remainder of it, if any should be left. It would be torturing the sense of the will to convert this into a general residuary clause. It is not distinguishable in principle from the cases of Ommanney v. Butcher, Turn. & Russ. R. 260, and Hastings v. Hane, 6 Sim. R. 67, in which similar residuary clauses were held to be special only. And there is less room for doubt than in the ease of Luckey v. Dykes, 2 S. & M. 60, in which a residuary clause was confined to a particular fund. On the principle of Mann v. Mann, 1 J. C. R. 231, the words used, “should there be any surplus left of money” would pass nothing but money.
*280 For the appellees it has been contended, that as that part of the will which provided for emanci, ating the slaves in Mississippi, by removing them to Africa, is void, all bequests designed for the purpose of carrying out this object are also void, or at least must fai>, as mere secondary or subsidiary dispositions for an illegal purpose. Hence it is said, the executor cannot sell the land in Mississippi, and as a consequence, that Mahorner’s right to the surplus of money to arise from that sale, must also be defeated. The general principle is, as stated, that an illegal bequest or devise, defeats all dependent bequests, subsidiary to and inseparable from it, which wohld otherwise be valid. 1 Jarman on Wills, 205; Roper on Legacies, 115, 135; Greaves v. Case, 4 Brown’s Ch. R. 67. This results from the fact, that oftentimes as the primary disposition fails, that which is secondary or dependent cannot be ascertained. Or when the law will not permit the purpose to be carried out, the fund appropriated to that object must from necessity fall into the general residuum, or go to the heir. On this principle, if the testator had directed his lands in Mississippi to be sold, and the proceeds applied to the transportation of the Mississippi slaves, the courts here might interpose in favor of the heir. But that is not the case. The proceeds of the sale of the lands in Virginia, Alabama and Mississippi, constitute a general fund for the transportation and the payment of all his slaves, as well those in Virginia as in Mississippi. It is conceded, that the slaves in Virginia may be emancipated, as the testator has directed. If so, it is immaterial how much or how little it may require of the fund which is to arise from the sale of the lands to accomplish that object. When the courts of Virginia shall decide that the will is void in regard to the slaves in that state, then we may interpose. But it may turn out, that not one half or one fourth of the sum appropriated for that purpose will be required ; this does not affect the devise; it is one of those accidental circumstances which is calculated to swell the residuum, and operate in favor of the residuary legatee of that fund, precisely as a void bequest swells the portion of the general residuary legatee of personal estate.
*281 By the eighth item, the testator directed his lands to be sold, and other moneys to be collected by his executors, “ for purposes mentioned in the tenth item.” Now what were the purposes in the tenth item mentioned? First, to pay the expenses of transporting his slaves to Africa, and to pay them their legacies when they arrived there. Second, that whatever remained should be equally divided between Mathias Mahorner and John Yeatman.
There is a class of cases so very much like this that it is necessary to advert to them for the purpose of showing the distinction. They contain this principle, that when lands are devised upon trust or for a par icular purpose, and there is an unexhausted residuum, as to which no further trust is declared, that residue results to the heir as real estate undisposed of. Jarman on Wills, 502. Judge Story says, “ Another form in which a resulting trust may appear, is where there are certain trusts created, either by will or deed, which fail in whole or in part; or which are of such an indefinite nature that courts of equity .will not carry them out; or which are illegal in their nature and character, or which are fully executed, and yet leave an unexhausted residuum. In all such cases there will arise a resulting trust to the party creating the trust, or to his heirs and legal representatives, as the case may require. 2 Equity Jurisprudence, 604, sec. 1196. This principle was very fully recognized in the celebrated case of Hawley v. James, 5 Paige, 318, and 7 Ibid. 213, and it was said if the devise be good in part and bad in part, there is a resulting trust in favor of the heir pro tanto. To illustrate this principle by the present case, the testator directed the whole of his lands to be sold, and the fund applied in emancipating his slaves in Virginia, and' also those in Mississippi. The trust fails in part because of its illegality, and if the will had been silent as to any further disposition, of course the heir could claim so much of the fund as would have been requisite to carry out the illegal purpose. But the will disposes of the residue, if there should be any, and thus takes the case out of this principle. It declares that if there should be any surplus of money, it shall go to Mahorner and *282 Yeatman. The resulting trust in favor of the heir, seems to depend upon the silence of the will as to the residue. 4 Kent’s Com. 306. In the case of King v. Denison, 1 Ves. & Beames, 272, Lord Eldon said, “ Where, therefore, the whole legal estate is given for the purpose of satisfying trusts expressed, and those trusts do not, in their execution, exhaust the whole, so much of the beneficial interest as is not exhausted belongs to the heir. But where the whole legal interest is given for a particular purpose, with an intention to give to the devisee the beneficial interest, if the whole is not exhausted by that particular purpose, the surplus goes to the devisee, as it is intended to be given to him.” Here the land was directed to be sold, and the whole of the fund directed to be applied to a particular purpose, with an intention to give to the devisees the beneficial interest, if the whole was not exhausted by that particular purpose. It is manifest that the testator intended that all his real estate should be sold and converted into money. This was a conversion of the real estate into money. It is also manifest, that the testator intended all the money resulting from the sale, and not consumed by the trusts, whether much or little, should be equally divided between Mahorner and Yeatman. His intention, as far as it is consistent with law, must govern. He knew that he was making an ample provision for the trusts, and that there would be a fund left, and that fund he disposed of. The language of the will justifies the construction that the sale was directed with a view, in part, to a division of the proceeds between the residuary legatees of that fund. If the sale had been directed only for the purposes of the trust, why did he direct any more land to be sold than was necessary 1
The conclusion is, that the testator died intestate as to the negroes in Mississippi, and they must go to the distributees. But that the devise of the land to be sold, does not fail. The decree of the vice-chancellor was, therefore, wrong in declaring void that provision in the will, which directed the executors in this state to sell the land situated here, and as to the money to be raised from other sources, to which extent it must be reversed.